**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **JAMES and JANICE BOATWRIGHT,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 08-0660-WS-B** |
| | ) | |
| **CARNEY REALTY, INC., *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter comes before the Court on Shirlee Poulos and Carney Realty, Inc.'s Motion for Summary Judgment (doc. 93). The Motion has been extensively briefed and is ripe for disposition.[1]

---

[1] Also pending are Plaintiffs' Motion to Supplement Record (doc. 111), Poulos and Carney's Motion for Leave to File Eighteen Page Reply Brief (doc. 121), Plaintiffs' Motion to Strike (doc. 124), and Poulos and Carney's Motion for Leave to File a Supplemental Authority (doc. 134). The Motion to Supplement is **granted** and plaintiffs' corrected exhibits 6, 7, 9 and 19 will be accepted as part of the record. The Motion for Leave to File a Supplemental Authority is **denied** because there is no reason to include a copy of the published *Stein v. Paradigm Mirasol* decision in the court file; however, the Court is aware of *Stein*'s existence and will refer to same as appropriate herein. The Court has also reviewed plaintiffs' Response (doc. 138) concerning the *Stein* decision and will address same. The Court will consider the Motion to Strike (and defendants' Response (doc. 129) to same) herein to the extent necessary to resolve the issues presented on summary judgment. With respect to the page limitation motion, defendants correctly observe that the Local Rules contemplate that "[a] reply brief by movant shall not exceed fifteen (15) pages in length." LR 7.1(b). Nonetheless, Poulos and Carney seek leave to file an 18-page reply, to address fully the issues presented in plaintiffs' opposition. Given the numerous issues debated in the parties' Rule 56 filings, defendants' request for a modest enlargement of the applicable page limit is not unreasonable, and is **granted** in the Court's discretion. Additionally, the Court notes that plaintiffs filed a 33-page brief (doc. 107) in opposition to the summary judgment motion, in derogation of Local Rule 7.1(b)'s 30-page cap, without leave to do so. Had the undersigned become aware of this defect earlier via motion to strike or otherwise, the non-conforming brief would have been stricken with instructions that plaintiffs refile it within the governing page limits. Under the circumstances, however, the most fair and equitable course of action is to consider the brief as filed, notwithstanding plaintiffs' noncompliance with Local Rule 7.1(b).

## I.      Nature of the Case.

This action is one of many filed in federal and state courts along the Gulf Coast in recent years involving a condominium deal gone bad.[2]  Plaintiffs, James and Janice Boatwright, entered into a contract with former defendant Bon Secour Development, LLC ("Bon Secour") in the summer of 2005 to purchase a pre-construction condominium unit at a development called Sunset Bay at Bon Secour Island Villas I ("Sunset Bay"), located in Gulf Shores, Alabama. Plaintiffs' expressed intention was to "flip" their unit at or before closing to obtain a sizeable and immediate return on their investment.  The Boatwrights closed on the unit in September 2007, but later came to regret that decision when the real estate market stumbled badly, rendering them unable to resell their property for anything approaching (much less exceeding) the price they had paid.  Plaintiffs filed suit in November 2008 in an attempt to rescind their purchase of the unit, to recover all deposits and payments made on same, and to obtain an award of compensatory and punitive damages.[3]

---

[2]      Judge Carnes could have been talking about this case when he recently observed, "In a market-based economy the price of housing, like other goods, is subject to swings. ... All bubbles eventually burst, as this one did.  The bigger the bubble, the bigger the pop.  The bigger the pop, the bigger the losses.  And the bigger the losses, the more likely litigation will ensue. Hence this case."  *Stein v. Paradigm Mirasol, LLC*, --- F.3d ----, 2009 WL 3110819, *1 (11th Cir. Sept. 30, 2009).

[3]      The parties have parlayed this relatively straightforward and uncomplicated fact pattern into a labyrinthine summary judgment record befitting some of the most complex commercial litigation seen in this District Court.  The record submitted by the parties (including defendants whose claims were settled after their summary judgment motions were filed) initially encompassed more than 2,800 pages of exhibits, including extensive redundancies (the same or overlapping deposition excerpts and agreements filed with both principal and opposition briefs), submission of bulk exhibits (most egregiously, the entire 330-page Offering Statement submitted by both sides despite scant mention of it in their briefs), and the inclusion of unexcerpted deposition transcripts by at least one party.  In addition to being unwieldy and inefficient, these filings violate the Local Rules' directive that "[i]f discovery materials are germane to any motion or response, only the relevant portions of the material shall be filed with the motion or response." Local Rule 5.5(c).  More generally, it is well established that a litigant on summary judgment cannot shift the burden to the court by inundating the record with voluminous exhibits, large portions of which are not addressed in his brief, with the expectation that the court will unearth any beneficial evidentiary nuggets that the filer may have neglected to mention.  *See, e.g., United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles

There are two pronounced differences between this action and the garden-variety condo disputes that have so often landed in this District Court of late. First, the Boatwrights are no longer pursuing claims against the developer (Bon Secour), which is generally the primary (and often the only) defendant in these sorts of cases.[4] Instead, the Boatwrights are suing Carney Realty, Inc. (Bon Secour's exclusive sales agent for Sunset Bay) and Shirlee Poulos (a real estate agent and co-owner of Carney) (collectively, the "Poulos Defendants").

Second, the breadth of the causes of action interposed by the Boatwrights is substantially more extensive than in the ordinary condominium case. Plaintiffs' kitchen-sink approach to pleading their claims resulted in eight overlapping and interrelated causes of action being joined against Carney and Poulos, as follows: a claim for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO"), based on predicate acts of mail and wire fraud; a claim for RICO conspiracy, pursuant to 18 U.S.C. § 1962(d), alleging that defendants and others conspired to violate § 1962(c); a claim for violations of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701 *et seq.* ("ILSFDA"), based on the theory that

---

buried in briefs."); *Preis v. Lexington Ins. Co.*, 508 F. Supp.2d 1061, 1068 (S.D. Ala. 2007) ("Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions."); *Carolina Acquisition, LLC v. Double Billed, LLC*, 627 F. Supp.2d 1337 (S.D. Fla. 2009) ("Federal judges are not archaeologists. ... We possess neither the luxury nor the inclination to sift through that mound of obfuscation in hopes of finding a genuine issue of material fact to deny summary judgment."). Accordingly, the Court will not squander scarce resources poring over uncited portions of this bloated record in search of evidence that might bolster one side or the other's position.

[4]     Although the Boatwrights initially named Bon Secour as a defendant, they announced last month that they had reached a *pro tanto* confidential settlement with that defendant. As a result, the Boatwrights' claims against Bon Secour were dismissed on October 7, 2009. (*See* doc. 125.) Bon Secour is no longer a party to this action. The Court has also been recently notified that the Boatwrights entered into settlements with three other defendants, to-wit: Thomas Bealle Associates, Inc. (the company that performed the second appraisal on the Boatwrights' unit), Bruce Bankston (the Thomas Bealle representative who appraised the unit) and Mortgage Solutions South, LLC (the lender that ordered the appraisal from Bankston). (*See* docs. 141, 144.) Accordingly, plaintiffs' claims against those defendants are no longer before the Court and will not be addressed in this Order. Certain facts concerning these ex-defendants will be addressed herein as part of the narrative for assessing the claims against the remaining defendants.

defendants employed a scheme to defraud the Boatwrights in connection with the sale of their unit; a claim for violations of the Alabama Uniform Condominium Act, Ala. Code §§ 35-8A-101 *et seq.* ("AUCA"); a claim for breach of fiduciary duty; and common-law claims for fraud, negligence, wantonness and conspiracy.

## II.   Background Facts.[5]

### A.   *The Plaintiffs.*

The record reflects that the Boatwrights are well-educated, experienced participants in the real estate field generally, and in condominium investments specifically.  Plaintiff James Boatwright is a licensed real estate agent who has actively worked in that capacity in Georgia and Alabama for approximately a decade.  (Mr. Boatwright Dep., at 15-19.)  Mr. Boatwright is well aware of the distinction between buyer's agents and seller's agents, having served in one or the other capacity in more than 100 real estate transactions.  (*Id.* at 19-21.)  His wife, plaintiff Janice Boatwright, earned a doctorate degree in education administration and formerly was employed as Superintendent of Schools in Harrison County, Georgia.  (Mrs. Boatwright Dep., at 15-20.)  In addition to their educational and professional backgrounds showing them to be sophisticated buyers, the Boatwrights were not neophytes to the condominium marketplace when they first encountered defendants in 2005.  To the contrary, the Boatwrights had previously purchased and still owned two condo units along the Gulf Coast for investment and rental purposes before they ever dealt with defendants in this case.  (*Id.* at 24.)[6]  The Boatwrights did not obtain appraisals or seek out expert opinions on valuation prior to purchasing either of their

_____

[5]      The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, the Boatwrights' version of the facts is taken as true and all justifiable inferences are drawn in their favor.

[6]      In particular, the Boatwrights had purchased a condo unit in Panama City, Florida in 2001 at a development called The Moondrifter.  (Mr. Boatwright Dep., at 24-25.)  The Boatwrights continue to own and rent out that unit today.  (*Id.*)  Likewise, the Boatwrights had purchased a condominium unit in Gulf Shores, Alabama in 2002 at a development called The Whaler.  (*Id.* at 27-28, 54.)  At present, plaintiffs continue to utilize the Whaler unit as a rental property, as well.  (*Id.* at 29-30.)  Mrs. Boatwright is active in administration of both The Moondrifter and The Whaler, inasmuch as she serves on the homeowners' association board of the former and is the president of the board of the latter.  (*Id.* at 24, 30.)

other condo units; rather, they decided to purchase them based on their personal assessment of the condominium market and their view that they were paying "a good price." (Mr. Boatwright Dep., at 26-27, 30-32.)

>    **B.**    ***Plaintiffs' Purchase of a Preconstruction Unit at Sunset Bay.***

In 2005, a friend of the Boatwrights mentioned the planned Sunset Bay development to them, indicating that "high end condos" were going to be built there. (Mr. Boatwright Dep., at 37-39.) Upon receiving this tip, the Boatwrights visited the Sunset Bay site, where they saw houses under construction, although no condominium buildings had been erected yet. (*Id.* at 39, 41-42.)[7] There was a clubhouse or yacht club on site, bearing a Carney Real Estate sign. (*Id.*) In or about June 2005, plaintiffs met with Shirlee Poulos at the Carney offices in the clubhouse, and expressed interest in purchasing a preconstruction condominium unit at Sunset Bay. (*Id.* at 39-40.). Plaintiffs' testimony is that Poulos "had a large board in her office with each unit in it ... and the parcels that she had persons that she had sold the units to, and the board was full. It was sold out on the board." (*Id.* at 40, 60.) There was also signage on or near the land where the Sunset Bay condominium buildings were to be built, and those advertising boards likewise contained "sold out" verbiage. (*Id.* at 44.)[8]

At plaintiffs' first in-person meeting with Poulos, Mr. Boatwright explained that plaintiffs "would only be interested in an end unit. I wouldn't be interested in any other inside unit." (Mr. Boatwright Dep., at 40.) Mr. Boatwright made it "very clear" to Poulos that plaintiffs were interested only in end units, and only at the Villas I building. (*Id.* at 58-60; Mrs. Boatwright Dep., at 45.) Poulos responded that there were no end units available; however, "later she came up with an end unit which I understood was a developer's unit." (Mr. Boatwright Dep., at 48, 58-59.) Poulos told plaintiffs that this unit was the last one available at

---

>    [7]    Plaintiffs state that their interest in Sunset Bay was for purposes of "flipping" a unit for a quick profit, rather than maintaining it as a rental or vacation property for any prolonged period of time. (*Id.* at 58, 93.) According to plaintiffs, "in the very beginning we talked about, you know, flipping" their Sunset Bay unit. (Mrs. Boatwright Dep., at 64.)

>    [8]    Mrs. Boatwright described a "big sign" on a road near the area where the condos were being constructed that read "sold out, or all sold, something to that effect." (Mrs. Boatwright Dep., at 118, 120-21.) That sign was posted sometime after June 2005. (*Id.* at 121.)

that price.  (*Id.* at 267.)  However, Poulos unequivocally told the Boatwrights from the outset "that the developer had some units" (*id.* at 42), and plaintiffs were aware that Bon Secour had held back units from the Sunset Bay pre-sales (*i.e.*, that the pre-sales only encompassed a portion, rather than all, of the planned units at the Sunset Bay development).[9]  This understanding is consistent with the developer's explanation that it only sought to pre-sell the minimum 26 of the 40 Sunset Bay units necessary to achieve financing, with the remaining units being held back by Bon Secour in hopes of realizing greater price appreciation at a later date. (Bryan Dep., at 35-36, 47-48.)

On or about June 30, 2005, plaintiffs entered into a reservation agreement with Bon Secour and delivered to Poulos a check for $5,000 as their escrow deposit.  (Mrs. Boatwright Dep., at 40-41; doc. 95, at Exh. E; Poulos Dep., at 86.)  By the terms of that agreement, plaintiffs reserved Unit 605 at Sunset Bay, with an expected purchase price of $659,900, subject to a reservation deposit of $5,000 that would be refunded in full if plaintiffs elected not to proceed with a purchase agreement.  (Doc. 95, at Exh. C.)  Pursuant to these provisions, it was clear from the face of the document that merely executing a reservation agreement in no way obligated (much less irrevocably committed) the Boatwrights to buy Unit 605.  (Poulos Dep., at 89.)[10] Rather, the Boatwrights, like other parties who entered into reservation agreements with Bon Secour, were free to walk away without penalty unless and until such time as they entered into a

---

[9]     The following exchange from Mrs. Boatwright's deposition reinforces the point:

"Q:     I believe you told me a second ago that she told you the developer had held some of the units?
"A:     That's right.
"Q:     So in the very first meeting y'all had with Ms. Poulos, you were aware the developer of this complex had withheld some of the units?
"A:     That's correct."

(Mrs. Boatwright Dep., at 44.)

[10]     Mr. Boatwright later professed not to understand this feature of the reservation agreement, indicating that if he had realized that he could cancel the reservation agreement at any time and recover his $5,000 deposit, "I would have canceled.  I wouldn't be sitting here today."  (Mr. Boatwright Dep., at 272.)  He also admitted that this fact would have been known to him had he simply read the agreement.  (*Id.*)

binding purchase agreement.

Although they were not legally bound to complete the sale until they signed the purchase agreement, the Boatwrights made their decision much earlier in the process. By their own admission, plaintiffs had already decided to purchase Unit 605 at Sunset Bay for the asking price of $659,900 before they executed the reservation agreement in June 2005. (Mr. Boatwright Dep., at 51.)[11] As of the time the Boatwrights made that decision, the only things that Poulos had told them consisted of mere "sales talk" about how beautiful the area was, how popular it would be, and the like, rather than any specific representations about valuation or resale potential. (Mrs. Boatwright Dep., at 53-54.)

In August 2005, plaintiffs entered into a preconstruction purchase agreement with Bon Secour to buy Unit 605 for the sum of $659,900. (Mr. Boatwright Dep., at 62-63.) In connection with that agreement, the Boatwrights arranged for a letter of credit to be presented to Bon Secour for 20% of the purchase price, or $131,980. (Mrs. Boatwright Dep., at 61.) At that time, the Boatwrights' bank "cautioned us and cautioned us and cautioned us and cautioned us that this letter of credit was giving our money, and we would not get it back. Once it went out, that was it. It would never be returned." (*Id.* at 62.) The Boatwrights proceeded with the transaction with that explicit understanding. Moreover, plaintiffs understood at all times that Poulos was acting as Bon Secour's agent in the sale of the unit to the Boatwrights. (Mr. Boatwright Dep., at 60-61.) Both the purchase agreement they executed for Unit 605 in August 2005 and the corresponding agreement they executed for Unit 705 two years later contained unequivocal disclosures that Carney Realty was acting as an agent of the seller (Bon Secour), and the Boatwrights knew that Poulos was not acting as their agent in the transaction. (Mrs. Boatwright Dep., at 58-61; Doc. 91, at Exh. E, ¶ 21 and Exh. F, ¶ 21.) At no time prior to entering into the August 2005 purchase agreement did the Boatwrights understand, or have any reason to believe, that Carney and Poulos were acting in any capacity other than that of the seller's agent. (Mr. Boatwright Dep., at 68.)

---

[11]     Prior to the June 2005 agreement, all of plaintiffs' dealings with Poulos and Carney were conducted in person. (*Id.* at 53.) However, plaintiffs had regular contact with Poulos via e-mail, and received numerous items from her in the mail, in 2006 and 2007. (Mrs. Boatwright Dep., at 268-69.)

In September 2005, shortly after signing the purchase agreement, the Boatwrights entered into a listing agreement with Carney and Poulos to attempt to resell Unit 605 (on which they had not yet closed). (Mrs. Boatwright Dep., at 85.)[12]  The Poulos Defendants notified the Boatwrights in writing prior to execution of that listing agreement that Carney could recommend a specific listing amount, but could not guarantee that amount. (*Id.* at 85-86.)  In the Property Listing Agreement they signed in September 2005, the Boatwrights specifically acknowledged "that there are no other agreements, promises or understanding either express or implied between them other than as specifically set forth herein." (Doc. 95, Exh. H, at ¶ 9.)  There is no indication in the record that any offers to purchase the Boatwrights' unit were made by any third party prior to the September 2007 closing.

Although plaintiffs had initially contracted to purchase Unit 605, in August 2007 the Boatwrights asked and were permitted to swap out Unit 605 in exchange for Unit 705, as a result of which plaintiffs agreed to pay a slightly higher contract price of $669,900. (Doc. 91, at Exh. F.)[13]  There was no negotiation concerning the purchase price of either unit, and the Boatwrights made no other offers. (Mr. Boatwright Dep., at 63-64.)[14]  Plaintiffs did not conduct any analysis of the propriety of Bon Secour's asking prices or whether those prices accurately reflected market conditions; instead, Mr. Boatwright "just took it for granted that was the going price on these type of units there." (*Id.* at 101.)  As he explained, "I saw what they were selling for, and I took it for granted that's what it would sell for.  So I didn't attempt to negotiate because I was

_____

[12]    This agency relationship apparently came about because the Poulos Defendants actively lobbied for it.  In a letter to the Boatwrights dated August 17, 205, Poulos indicated that "Going forward, I'm prepared to represent 'YOU' in getting the very most for your investment, as soon as you are ready to 'Flip' ...." (Doc. 107, Exh. 13.)

[13]    The Boatwrights' reasons for changing units involved dissatisfaction with certain features of Unit 605. (Mrs. Boatwright Dep., at 87-88.)  When plaintiffs asked to exchange units on that basis, Poulos and Bon Secour accommodated their request by making arrangements for them to purchase Unit 705 rather than Unit 605. (*Id.* at 91-92.)  The circumstances of plaintiffs' exchange of Unit 705 for Unit 605 are not material to plaintiffs' causes of action, and are purely incidental to this litigation.

[14]    Mr. Boatwright's understanding based on his conversations with Poulos was that the commission on the transaction would be split equally between Poulos (the sellers' agent) and Mr. Boatwright (who was effectively acting as buyers' agent). (*Id.* at 74-75.)

going to flip it, and I could do the arithmetic and see what I was going to make out of it." (*Id.* at 102.)

Ultimately, the Boatwrights closed on Unit 705 on or about September 28, 2007. (Doc. 91, Exh. L.) Thereafter, the Boatwrights' dreams of "flipping" their unit for a large profit evaporated when, as Mr. Boatwright put it, "the market oversold, actually, and the bubble popped, as far as the bubble is concerned," as a result of which the condo market "came down as far as the demand." (Mr. Boatwright Dep., at 104-05.) This in turn diminished the resale value of Unit 705. (*Id.* at 221.) As a result, the Boatwrights find themselves in a position where their gamble on Sunset Bay has not paid off, and they are "stuck with" a condominium unit that appears to be worth substantially less in the marketplace today than at the time of the closing.

### C.    *Alleged Misrepresentations by the Poulos Defendants.*

Between the June 2005 reservation agreement and the September 2007 closing, plaintiffs contend, various material misrepresentations were made to them concerning Sunset Bay.

In virtually identical affidavits submitted during the Rule 56 briefing process, the Boatwrights catalogue the alleged misrepresentations made by the Poulos Defendants prior to execution of the August 2005 purchase agreement as including the following communications: (1) statements "that the Island Villas were all sold out,"[15] (2) statements "that the prices would be (or were) raised at least $100,000 for re-sale to end purchasers," (3) statements "that we would never have to close," and (4) statements "that there were end purchasers standing in line to buy because the Island Villas were so high-end and in demand." (Mr. Boatwright Aff., ¶ 2; Mrs. Boatwright Aff., ¶ 2.)[16] The Boatwrights maintain that had they known the truth on these

---

[15]    On this point, it is undisputed that fewer than all units at Phase I of the Island Villas condominium development in Sunset Bay had been sold when the Boatwrights reserved Unit 605 in June 2005. (Poulos Dep., at 86-87.) Poulos denies having told the Boatwrights anything to the contrary (*id.* at 87), but of course it is plaintiffs' version of the evidence (and not defendants') that is credited on summary judgment.

[16]    Plaintiffs also identify evidence that such representations continued after execution of the purchase agreement. For example, the Boatwrights reference a November 2005 newsletter from the Poulos Defendants stating prominently as follows: "**PRE-SALES** for Sunset Bay Island Villas: **SOLD OUT**." (Doc. 107, Exh. 9, at 1 (emphasis in original).) Plaintiffs also point to an October 28, 2005 letter from the Poulos Defendants to Sunset Bay owners stating as

points, "we would not have entered the reservation agreement, paid our reservation deposit, entered our purchase agreement, [or] paid our escrow deposit."  (Mr. Boatwright Aff., ¶ 2; Mrs. Boatwright Aff., ¶ 2.)

In deposition testimony, plaintiffs expounded on each of these areas of alleged misrepresentation by the Poulos Defendants.  For example, Ms. Boatwright testified that the first inkling she had that not all of the units at Sunset Bay's Villa I were sold out was in June 2008 (nine months after their closing), when they received a brochure reflecting that certain units were up for auction.  (Mrs. Boatwright Dep., at 117-18.)   Mr. Boatwright testified that Poulos told them they would never have to close on their unit because "she had end users, another buyer lined up that we could close it simultaneously."  (Mr. Boatwright Dep., at 84.)  According to Mr. Boatwright, Poulos also said that prices for Sunset Bay units "were increasing almost $100,000 each quarter," and that flipping their unit "would be no problem, we've had people standing in line for these units."  (*Id.* at 93-94.)  Poulos represented to the Boatwrights that they could resell their unit for approximately $100,000 more than they had paid.  (*Id.* at 95-96, 98)  As Mr. Boatwright put it, Poulos "told me about $100,000, flip it for about a hundred."  (*Id.* at 193.)  At various times, Poulos told the Boatwrights that "we have several people who are interested" in Unit 705, which plaintiffs listed for $750,000 because Poulos "said she felt she could get that for us and that's what it would be worth."  (Mrs. Boatwright Dep., at 292.)

According to the Boatwrights, had they learned the truth on these matters prior to the September 2007 closing, "we [would] have demanded an immediate refund and cancellation" of the purchase agreement.  (Mr. Boatwright Aff., ¶ 3; Mrs. Boatwright Aff., ¶ 3.)  Thus, plaintiffs' position at the heart of their claims against the Poulos Defendants is that they would not have agreed to purchase a unit at Sunset Bay, much less closed on that purchase, were it not for Poulos's statements to them that the Sunset Bay condominium units were sold out, that prices would be raised by $100,000 for resale purposes, that they would never have to close, and that

---

follows: "We have sold all the pre-sales for Sunset Bay Island Villas ...."  (*Id.*, Exh. 17, at 2.) On or about July 21, 2005, the Poulos Defendants sent the Boatwrights a letter stating that "[y]our investment can only increase," and providing a matrix (with no explanatory verbiage) showing names, unit numbers and prices for each of the 24 Phase I units and the 16 Phase II units.  (*Id.*, Exh. 11.)

end users were awaiting the opportunity to purchase plaintiffs' unit.

      **D.**       ***The Appraisals of Unit 705.***

      The Boatwrights performed no investigation or market research into the value of Unit 705 in advance of the closing.  At no time did the Boatwrights request an appraisal of their Sunset Bay unit or undertake any meaningful effort to ascertain whether they were paying a reasonable price.  They just took it on faith that Unit 705 was worth the contract amount. Notwithstanding plaintiffs' omissions, Unit 705 was appraised not once but twice in the weeks leading up to the closing at the request of a pair of lenders, pursuant to the Boatwrights' efforts to obtain a mortgage loan.

      Plaintiffs decided to pay $260,000 of the purchase price for Unit 705 in cash at closing, and to borrow the remaining $417,000.  (Mr. Boatwright Dep., at 131-132.)  Poulos recommended that the Boatwrights talk with Jeff Powell of ex-defendant Mortgage Solutions South about financing.  (*Id.* at 190.)  However, she never told the Boatwrights that they were required to speak with Powell, much less that they were obligated to use Mortgage Solutions as their lender.  (Mrs. Boatwright Dep., at 107.)  At most, Poulos vouched for Powell as being "a fine man and ... an honest man, things like that."  (*Id.* at 113.)  Plaintiffs understood at all times that they were free to use any lender they wished, and that their purchase of Unit 705 was in no way contingent on their obtaining financing through any particular source.  (Mr. Boatwright Dep., at 108.)

      Even after Poulos recommended Mortgage Solutions, the Boatwrights decided in the first instance to bypass that suggestion (as was their right) and instead work with another lender of their choosing.  In that regard, the Boatwrights made a financing inquiry to nonparty Chase Mortgage, with whom they had previously financed a condominium unit purchase.  (Mr. Boatwright Dep., at 122.)  Chase arranged for an appraisal of that unit to be performed, after which it reported to the Boatwrights that the appraised value of Unit 705 was $610,000.  (*Id.* at 122-26.)  Not only was this figure significantly below the $750,000 resale price that the Boatwrights were eyeing, but it was also nearly $60,000 below the price they had agreed to pay. Plaintiffs did not take the news gracefully.  Mr. Boatwright was, in his words, "flabbergasted" and "blew [his] stack" because the appraised value was much lower than he had anticipated.  (*Id.* at 125-28.)  Mrs. Boatwright likewise expressed dismay, testifying that she "almost died" upon

hearing the appraisal figure.  (Mrs. Boatwright Dep., at 102-03.)[17]

The source of plaintiffs' consternation with the Chase appraisal was not that it would preclude them from closing on Unit 705.  To the contrary, the $610,000 appraisal did not jeopardize plaintiffs' ability to obtain the requested $417,000 in financing.  Mrs. Boatwright understood that Chase was ready to finalize the loan, if only the Boatwrights were willing to go through with the deal.  (*Id.* at 106.)[18]  Nor did the Boatwrights view the Chase appraisal as a signal that they should think twice (or at least conduct further investigation) about their planned $669,900 investment in Unit 705.  Rather, the Boatwrights' ire was raised by the Chase appraisal because they feared it might hamper their designs of reselling the unit in the near term for approximately $750,000 as they had intended.  (Mr. Boatwright Dep., at 122-23, 127.)  In other words, they viewed the Chase appraisal as a hindrance to their ability to flip the unit quickly. The record is unmistakably clear that it was in that spirit, and that spirit alone, that the Boatwrights balked.  They did not hire their own appraiser.  They did not investigate whether the Chase appraisal might have a kernel of validity.  Instead, they endeavored to bury the Chase appraisal so that it would not interfere with their resale plans.

Because of that appraisal, the Boatwrights decided not to obtain financing through Chase. (Mr. Boatwright Dep., at 122-23, 127.)  Accordingly, upon receipt of the $610,000 appraisal figure, Mrs. Boatwright pointedly informed Chase, "we're not gonna be able to accept this.  We can't accept this."  (Mrs. Boatwright Dep., at 104.)  She then, in her own words, became "hysterical" and "threw a fit" to Poulos, who reassured Mrs. Boatwright that it was a "bad appraisal" because "[t]he guy didn't know what he was doing."  (*Id.* at 105, 276.)  According to Mrs. Boatwright, Poulos told her to go to Jeff Powell at Mortgage Solutions, indicating, "You'll

_____

[17]     Mrs. Boatwright's testimony was that she told the Chase representative that "if you're telling us that the property is worth 610, then we know our money is shot, we've lost that amount of money.  That's just the way I looked at it."  (Mrs. Boatwright Dep., at 104.)

[18]     Mr. Boatwright's understanding was similar, as he indicated that the Chase representatives advised him that the Boatwrights "can get your loan amount on this appraisal." (Mr. Boatwright Dep., at 206.)  He acknowledged that Chase had not declined the requested loan but that he "wanted an appraisal that was comparable to what I paid for the unit."  (*Id.* at 207-08.)

get a good appraisal.  I guarantee you you'll get a good appraisal.  All you need to do is go to

him."  (*Id.*)  Acting on this suggestion, plaintiffs then contacted Powell at Mortgage Solutions.

(Mr. Boatwright Dep., at 129.)  Plaintiffs decided of their own volition to work with Mortgage

Solutions after Poulos recommended that lender and after they became distraught over the Chase

appraisal.  (*Id.* at 121, 125, 129-30; Mrs. Boatwright Dep., at 108.)  Mr. Boatwright did not

inform Mortgage Solutions about the Chase appraisal.  (Mr. Boatwright Dep., at 130; Powell

Dep., at 132.)[19]

When the Boatwrights contacted Powell to request financing of $417,000 of the purchase

price for Unit 705, Mortgage Solutions sent an email dated September 18, 2007 to ex-defendant

Bruce Bankston, an appraiser affiliated with ex-defendant Thomas Bealle Associates ("TBA"),

asking him to appraise that unit.  (Bankston Dep., at 29.)[20]  The request was made directly from

Mortgage Solutions to Bankston, and did not go through any intermediary at TBA.  (*Id.* at 35.)[21]

Mortgage Solutions also sent Bankston a copy of the Boatwrights' purchase agreement, so he

was aware of the contract price for Unit 705.  (*Id.* at 29-30.)  Plaintiffs had no role in selecting

the appraiser that Mortgage Solutions used.  (Mr. Boatwright Dep., at 130-31; Mrs. Boatwright

---

[19]    In explaining why they never sent a copy of that appraisal to Mortgage Solutions,
Mrs. Boatwright said, "We were very ashamed of that appraisal," and indicated that they did not
want anyone to know about it.  (Mrs. Boatwright Dep., at 115.)

[20]    Bankston appraised a total of four units at Sunset Bay at various times.  (*Id.*)  In
that capacity, he coordinated with Poulos and Carney to obtain necessary information to perform
the appraisals, to access the building, and the like.  (*Id.* at 31-32.)  At no time did Poulos or
Carney ever request that Bankston perform any appraisal services for them.  (Poulos Dep., at 22-
23.)  Furthermore, Poulos denies that she ever had conversations with TBA or Bankston about
pricing or appraisal values for any Sunset Bay units at any time.  (*Id.* at 196-99.)

[21]    Mortgage Solutions selected Bankston to appraise the Boatwrights' unit because
Powell knew from prior conversations with Poulos that Bankston was familiar with the Sunset
Bay development.  (Powell Dep., at 88-89, 92-94.)  Powell did not speak with Bankston
specifically about the Boatwright appraisal ahead of time.  (*Id.* at 87.)  Powell explained that it
was important to use an appraiser who was already familiar with the development because that
person would have knowledge of condominium documents and "[y]ou want somebody that
knows the project and knows the area and knows the market and knows comparable projects."
(*Id.* at 94-95.)  It is uncontroverted that Powell did not simply take Poulos's word that Bankston
was familiar with Sunset Bay, but instead conducted his own investigation to confirm that such
was the case before giving Bankston the assignment.  (*Id.* at 148-49.)

Dep., at 111-12.)  At no time did Poulos or Carney suggest any particular appraiser to plaintiffs.
(*Id.*)  Plaintiffs were wholly unfamiliar with the appraiser retained by Mortgage Solutions.  (Mr.
Boatwright Dep., at 191; Mrs. Boatwright Dep., at 113.)

In any event, Bankston visited the property on September 21, 2007 to gather information.
(Bankston Dep., at 36-37, 39.)  At that time, Bankston was entirely in the dark about the Chase
appraisal; in fact, he "never knew anything about an original appraisal."  (*Id.* at 115.)  Bankston
emailed his completed appraisal to Mortgage Solutions on September 24, 2007.  (Bankston Aff.,
¶ 4.)  Thereafter, TBA sent an invoice to Mortgage Solutions in the amount of $350, its standard
fee, of which 66% was paid to Bankston per agreement between TBA and Bankston.  (*Id.*, ¶ 6;
Bankston Dep., at 69-70; doc. 91, Exh. J at 18.)

The appraisal completed by Bankston for TBA's client, Mortgage Solutions, listed an
appraised value for Unit 705 of $750,000 as of September 21, 2007.  (Doc. 91, Exh. J.)  Both
Bankston and Poulos deny having any substantive conversations, either directly or through
Mortgage Solutions, concerning the amount of that appraisal.  (Poulos Dep., at 159; Bankston
Dep., at 115-16.)  Plaintiffs were satisfied with Bankston's appraisal, which provided a
sufficiently high valuation figure to facilitate their intended resale of the unit for approximately
$750,000.  Mr. Boatwright deemed the Bankston appraisal to be in line with his own assessment
of Unit 705's true value, deeming it "pretty appropriate after what I had thought up to that
point."  (Mr. Boatwright Dep., at 131.)  Mrs. Boatwright had a similarly favorable reaction to
that appraisal, saying that "[w]e felt like we weren't getting gipped."  (Mrs. Boatright Dep., at
116.)

Plaintiffs concede that neither the Chase appraisal nor the Bankston appraisal affected the
contract price they paid at closing.  (Mr. Boatwright Dep., at 217-18.)  The Boatwrights had
entered into a purchase agreement obligating them to buy Unit 705 for the stated price long
before the Bankston appraisal was prepared.  (*Id.* at 229.)  As Mr. Boatwright explained, the
significance of the appraisal value to plaintiffs lay in enhancing the resale price the Boatwrights
could obtain for the unit.  (*Id.* at 219-20.)  That said, Mr. Boatwright did not particularly trust the
Bankston appraisal, indicating that "[i]t smells fishy ... if I had 610 and 750 on the same unit,
two different appraisers."  (*Id.* at 230.)  In fact, Mr. Boatwright candidly acknowledged that the
discrepancy between the two appraisals "did bother me a lot."  (*Id.*)  Nonetheless, he did not

-14-

pursue that issue further, but instead moved forward with the closing "[b]ecause I wanted the unit." (*Id.*)

Plaintiffs have no evidence that the $750,000 value on the Bankston appraisal was not, in fact, the market value of that property on the date the appraisal was performed. (Mr. Boatwright Dep., at 232.) Nonetheless, the Boatwrights contend that Bankston's appraisal injured them because it "cost [them] $100,000 – $90,000 that [they] won't be able to get" because they thought they could resell Unit 705 for $750,0000 immediately after they paid $669,900 for it. (Mrs. Boatwright Dep., at 262.) In virtually identical preprinted, fill-in-the-blank Affidavits dated September 21, 2009, each of the Boatwrights avers as follows:

> "[T]he appraisal performed by Bankston and T&B was instrumental in Poulos and Carney convincing us that the Island Villas were sold out, were worth the $100,000.00 profit as represented (or close enough), and that the representations and suppressions ... were all true except that we have to close. Had we known the truth we would not have closed, demanded our money back, or at worst walked away from our $132,000 deposit as opposed to closing."

(Mr. Boatwright Aff., ¶ 4; Mrs. Boatwright Aff., ¶ 4.)

## III.   Summary Judgment Standard.

Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).

"Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## IV.    Analysis.

The Boatwrights have brought claims against the Poulos Defendants for RICO violations predicated on mail and wire fraud, RICO conspiracy, ILSFDA violation, violation of the Alabama Uniform Condominium Act, breach of fiduciary duty, fraud, negligence/wantonness, and civil conspiracy.  The Poulos Defendants now move for summary judgment as to all of those causes of action.

### A.    *The RICO Claims Fail for Lack of Evidence of a Direct Relation between the Conduct and the Injury.*

The Boatwrights' RICO theory is that defendants engaged in a pattern of racketeering activity consisting of mail or wire fraud.  As such, the Boatwrights must show, *inter alia*, that the Poulos Defendants participated in a scheme to defraud them out of money or property, and used interstate mails or wires in furtherance of that scheme.  *See, e.g., Bridge v. Phoenix Bond & Indem. Co.*, --- U.S. ----, 128 S.Ct. 2131, 2138, 170 L.Ed.2d 1012 (2008) ("The upshot is that RICO provides a private right of action ... to any person injured in his business or property by reason of the conduct of a qualified enterprise's affairs through a pattern of acts indictable as mail fraud."); *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) ("The elements of mail and wire fraud are: (1) intentional participation in a scheme to defraud, and (2) the use of the interstate mails or wires in furtherance of that scheme."); *Kemp v. American Tel. & Tel. Co.*, 393 F.3d 1354, 1359 (11th Cir. 2004) ("In order to bring a RICO claim where mail or wire fraud serves as the predicate activity, it is necessary to show that ... the defendant intentionally participated in a scheme to defraud another of money or property ....").

Plaintiffs' RICO cause of action also requires them to show a direct relation between the alleged RICO violations and the injuries for which plaintiffs seek relief.  Indeed, "[i]n order for a pattern of racketeering activity to be a cognizable cause of civil RICO injury to a private plaintiff, one or more of the predicate acts must not only be the 'but for' cause of the injury, but the proximate cause as well. ... Plaintiffs must show a direct relation between the injury asserted and the injurious conduct alleged."  *Green Leaf Nursery v. E.I. DuPont De Nemours and Co.*,

341 F.3d 1292, 1307 (11th Cir. 2003); *see also Williams v. Mohawk Industries, Inc.*, 465 F.3d 1277, 1287-88 (11th Cir. 2006) ("when a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries. ... [I]n RICO cases there must be some direct relation between the injury alleged and the injurious conduct in order to show proximate cause.") (internal citations and quotation marks omitted).  The Poulos Defendants persuasively argue that there is no direct relation between plaintiffs' claimed injuries and the alleged RICO conduct.

Plaintiffs' brief identifies a series of events that they contend were racketeering activities amounting to predicate acts under RICO.  (Doc. 105, at 14-15.)  With one exception (which will be addressed separately), all of the identified purported predicate acts that relate to the Boatwrights postdate their execution of the August 23, 2005 purchase agreement.[22]  Plaintiffs' reliance on post-August 23, 2005 conduct is inadequate as a matter of law to satisfy the "direct relation" standard for proximate causation for their RICO cause of action.

The reason for this conclusion lies in the plain language of the August 2005 purchase agreement into which the Boatwrights entered with Bon Secour (the seller).  Paragraph 1 of that agreement provided that "the Seller agrees to sell and convey to the Purchaser and the Purchaser agrees to purchase from the Seller the Condominium Unit."  (Doc. 95, Exh. G, at ¶ 1.) Paragraph 13(A) detailed Bon Secour's remedies in the event of a default by the Boatwrights as follows:

> "Should the Purchaser ... fail to consummate this transaction for any reason ... or refuse to execute the instruments required to close this transaction, or refuse to pay the cost or other sums required by this Agreement, or otherwise default under this Agreement, the Seller shall have the right to pursue any remedy available at law or in equity as a result of such breach, including specifically, without limitation: (a) the right to cancel this Agreement and recover damages against the Purchaser for the breach by the Purchaser of this Agreement, and (b) the right to

---

[22]     In their "pattern of racketeering activity" section, plaintiffs also identify alleged fraudulent acts directed by the Poulos Defendants at other condominium purchasers at other times.  While such evidence may be helpful in establishing RICO prerequisites such as an enterprise, a pattern of racketeering activity and continuity, it is not illuminating as to causation. What defendants may have done to other condominium buyers at other times could not have proximately caused the Boatwrights' losses in this case by inducing the Boatwrights to sign a purchase agreement or close on a Sunset Bay condominium unit purchase.

enforce specific performance of this Agreement to the extent that specific
performance is an available remedy under Alabama law."

(Doc. 95, Exh. G, at ¶ 13(A).)  This provision means exactly what it says.  Once they executed
the purchase agreement in August 2005, the Boatwrights were not at liberty to change their
minds and walk away from the deal if they decided that the condo purchase was not a prudent
investment.  If they refused to close, the Boatwrights' exposure was not limited to mere
forfeiture of their 20% letter of credit; rather, they would have remained on the hook for the
entire purchase price of their unit via legal proceedings for specific performance or damages.[23]

Plaintiffs were well aware of their contractual obligation to close on their Sunset Bay
unit.  Indeed, when asked about this very point, Mr. Boatwright shied away from any suggestion
that they were not contractually obligated to close, saying, "I didn't say I didn't have to buy it."
(Mr. Boatwright Dep., at 227.)  He further acknowledged that had the Boatwrights refused to
close, it "would have been their prerogative" for Bon Secour to sue them for defaulting on the
agreement.  (*Id.*)  Yet plaintiffs' theory of causation for their RICO claims is that "(1) the
Boatwrights were sold a condominium unit of lesser value than that which defendants knew and
represented to them; (2) the defendants did this to enrich themselves; (3) the Boawrights [*sic*]
***would not have closed on their unit but for the scheme, including the appraisal***; and (4) and
[*sic*] the Boatwrights have been financially damaged."  (Doc. 105, at 18 (emphasis added).)  So,
with respect to RICO predicate acts occurring after August 2005, plaintiffs contend that
defendants' injurious conduct is directly related to their injuries because they would not have
closed in the absence of such conduct.  As discussed above, however, the Boatwrights were

---

[23]     Alabama courts have recognized that sellers of real property may use the remedy
of specific performance upon breach by purchasers.  *See, e.g., Alabama Processing Co. v.
Utilities Bd. of Town of Citronelle*, 527 So.2d 690, 691 (Ala. 1988) (holding that vendor was
entitled to specific performance of contract to sell real estate when buyer later refused to go
through with the purchase); *Barksdale v. Temerson*, 38 So.2d 5, 7 (Ala. 1948) (in real estate
context, "a bill in equity for specific performance is a recognized method by which the vendor
may enforce the contract and recover the stipulated purchase price"); *George E. Wood Lumber
Co. v. Morris*, 142 So. 508 (Ala. 1932) ("A vendor of real estate may maintain a bill for specific
performance against his purchaser."); *see generally* Ala. Code § 8-1-47 ("It is to be presumed
that the breach of an agreement to transfer real property cannot be adequately relieved by
pecuniary compensation," such that specific performance is warranted).

contractually obligated as of August 2005 to pay the full purchase price, and did not have the luxury of opting out.  Accordingly, the injury claimed by plaintiffs (*i.e.*, adverse financial consequences from closing on their unit) could not possibly be proximately caused by RICO conduct occurring after their contractual obligation to close was already locked in place.[24]

Thus, in order for the "direct relation" causation standard to be satisfied, plaintiffs must be able to point to RICO violations predating the August 23, 2005 purchase agreement.  If there is evidence that RICO predicate acts occurred prior to that date and that they induced the Boatwrights to enter into the purchase agreement, then plaintiffs would have a colorable causation argument concerning their RICO claim to present at trial.  But the only pre-August 23 conduct identified by plaintiffs as to the Boatwrights in the "pattern of racketeering activity" section of their brief is a letter from Poulos to the Boatwrights dated August 17, 2005.  The Boatwrights do not show anything false or misleading about the August 17 letter, or even explain how that letter amounts to a RICO predicate act.  That letter does not state that Sunset Bay is sold out, it specifically declines to offer any estimates of resale value of the Boatwrights' property, and it offers no guarantees or representations about the timing or likelihood of resale. (Doc. 107, Exh. 13.)[25]  More importantly, the Boatwrights fail to make any showing that the

---

[24]     Confronted with this compelling rationale on summary judgment, plaintiffs weakly counter that their RICO claims are not limited to acts prior to execution of the purchase agreement because "Carney and Poulos, and Bankston and T&B for that matter, would not obtain the Boatwrights' money via their fraudulent scheme unless they could get the Boatwrights to close on their unit, i.e. purchase the unit.  Carney and Poulos would receive a commission. Bankston and T&B would get their appraisal fee."  (Doc. 105, at 15-16.)  This reasoning fails for two reasons.  First, plaintiffs confuse the issue by focusing on a nexus between the injurious RICO conduct and a possible benefit to defendants.  That's not the question; rather, the applicable causation standard under RICO is whether there is a direct relation between the injurious RICO conduct and the injury suffered by plaintiffs.  Second, even taken at face value, plaintiffs' argument is not supported by the record.  There is no evidence that the Poulos Defendants would not receive a commission (or that the Bankston Defendants would not receive their $350 appraisal fee) if the seller had to resort to legal proceedings to force the Boatwrights to fulfill their contractual obligation to purchase their unit.  The Court cannot and will not simply assume that this is the case, in the absence of any evidentiary basis for doing so.

[25]     The Boatwrights mischaracterize the August 17 letter in their affidavits, wherein they state that the Poulos Defendants communicated to plaintiffs "via the mails on at least August 17, 2005 ... that the Island Villas were all sold out, that the prices would be (or were)

August 17 letter (which on its face was simply a pitch for the Boatwrights to list their unit with the Poulos Defendants) induced them to enter into the underlying purchase agreement. Once again, then, as to the August 17 letter, the "direct relation" element is missing and plaintiffs have mustered no evidence from which a reasonable factfinder could conclude that Poulos's representations in that letter proximately caused the Boatwrights' injuries by inducing them to sign the purchase agreement under false pretenses.

In the absence of any evidence of a direct relation between the allegedly injurious conduct and the injuries for which recovery is sought, plaintiffs cannot prevail on their RICO cause of action against the Poulos Defendants, as a matter of law.[26]

_____

raised at least $100,000.00 for re-sale to end purchasers, that we would never have to close, and that there were end purchasers standing in line to buy ...." (Mr. Boatwright Aff., ¶ 2; Mrs. Boatwright Aff., ¶ 2.) Under no reasonable reading can the August 17 letter be construed as making any such representations. To make matters worse, plaintiffs' brief misstates the August 17 letter by alleging that it "misrepresented that their investment at Sunset Bay had a value of just under $500 per sq. ft., and their purchase price was 365 per sq. ft." (Doc. 105, at 7.) This characterization at most is not supported by the exhibit. At most, that letter stated that the Boatwrights' purchase "hasn't exceeded $500 per sq. ft." (Doc. 107, Exh. 13, at 1.) That statement is true, given that Unit 705 was 1,706 square feet and had a sale price of $669,900, or $392 per square foot. Similarly, the August 17 letter did not state that the Boatwrights were paying $365 per square foot, but instead said that "Villas I is being sold to you *at an average of* $365 per sq ft." (*Id.* at 2 (emphasis added).) Under any reasonable reading, the $365 figure is referring to the average price per square foot paid by Villa I purchasers, not the actual price that the Boatwrights had agreed to pay. Plaintiffs' counsel do not advance their cause by distorting exhibits in their summary judgment memoranda.

[26]        A generous reading of plaintiffs' brief might support a finding that plaintiffs' RICO theory is that the scheme animating the RICO enterprise was to conceal fraudulent misrepresentations and omissions foisted upon the Boatwrights antecedent to their execution of the purchase agreement. In that regard, plaintiffs argue in passing that the Bankston appraisal "was intended to prevent and did prevent the Boatwrights from discovering the fraud and from exercising their contractual and common law rights to demand the full return of their deposit money and cancellation of their sales agreement." (Doc. 105, at 19.) (Implicit in such a contention is the notion that such pre-August 2005 fraud, if revealed to the Boatwrights before closing, would have entitled them to rescind or void the purchase agreement under a fraudulent inducement theory, which plaintiffs have not developed here.) Even assuming that plaintiffs' fuzzy, ill-defined RICO claims are founded on such a theory and that such a theory is conceptually adequate to satisfy RICO's "direct relation" test, dismissal of those claims would remain appropriate given the dearth of evidence (as discussed *infra*) that the Poulos Defendants

### B.     The  ILSFDA Claim Fails under Stein.

Defendants also move for summary judgment on the Boatwrights' claims under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701 *et seq.* (the "ILSFDA").[27]  The statute makes it unlawful for any developer or agent, in connection with the sale of a nonexempt lot, "to employ any device, scheme, or artifice to defraud" or "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser."  15 U.S.C. § 1703(a)(2)(A) & (C).  The Eleventh Circuit has taken a dim view of claims brought under the ILSFDA, describing it as "a federal statute that has become an increasingly popular means of channeling buyer's remorse into a legal defense to a breach of contract claim."  *Stein v. Paradigm Mirasol, LLC*, --- F.3d ----, 2009 WL 3110819, *1 (11th Cir. Sept. 30, 2009).

The Boatwrights' ILSFDA claims are fatally flawed because plaintiffs' unit is exempt from the statute.  On its face, the ILSFDA does not apply to "the sale or lease of land under a contract obligating the seller or lessor to erect such a building thereon within a period of two years."  15 U.S.C. § 1702(a)(2).  The statutory prohibitions on the use of a scheme or artifice to defraud and the conduct of any practice which operates as a fraud or deceit on a purchaser apply only to the sale or lease of "any lot not exempt under section 1702(a)."  § 1703(a)(2).  Accordingly, if the Boatwrights' unit falls within the two-year exemption, then their ILSFDA

---

misled or deceived the Boatwrights into signing the purchase agreement.  Simply put, there is no evidence of any underlying fraudulent inducement, so there was nothing to cover up, and therefore no proximate causation between the alleged RICO activities and the injuries for which the Boatwrights seek relief.

[27]     No reliance or causation issues are implicated as to this claim on summary judgment.  There is substantial authority finding that no reliance is necessary for an aggrieved purchaser to recover under the ILSFDA for the types of violations alleged herein.  *See, e.g., Gibbes v. Rose Hill Plantation Development Co.*, 794 F. Supp. 1327, 1336 (D.S.C. 1992) ("Plaintiff need not show reliance on defendant's statements in order to prove a violation of § 1703(a)(2)(A) or (C)."); *Gilbert v. Woods Marketing, Inc.*, 454 F. Supp. 745, 749 (D. Minn. 1978) (opining that plaintiffs may establish claims under § 1703(a)(2)(A) and (C) "without proof of reliance, so long as the principal alleged fraud is a failure to disclose").  Additionally, the ILSFDA section extending a private civil right of action to aggrieved purchasers does not set forth a specific causation requirement, but merely provides that "the court may order damages, specific performance, or such other relief as the court deems fair, just, and equitable."  § 1709(a).

claims under § 1703(a)(2) are not cognizable as a matter of law.

The purchase agreements signed by the Boatwrights and Bon Secour include express language that "[t]he Seller agrees to complete the construction of the Unit and the Building in which the Unit is to be located, on or before that certain date (the "Construction Completion Date") which is two (2) years from the Effective Date (as defined in this Agreement)." (Doc. 91, Exh. E, at ¶ 7(B); doc. 91, Exh. F, at ¶ 7(B).) This language places the Boatwrights' unit squarely within the two-year exemption of § 1702(a)(2). Nonetheless, the Boatwrights maintain that the *force majeure* clause contained in those agreements removes their unit from the ambit of the exemption. That clause reads as follows:

> "Provided, Further, the Seller shall have the right, at the election of the Seller, to extend the Construction Completion Date to the extent that the Seller is delayed in the completion of the construction of the Unit or said Building by fire or any other casualty, hurricane or other natural disaster or act of God, strike or similar act of work stoppage, legal proceedings filed against the Seller with respect to the said construction, or the refusal by any governmental entity to issue any permit or license necessary to the said construction or completion of said construction, or the withdrawal by any such governmental entity of any such permit or license."

(Doc. 91, Exh. E, at ¶ 7(B); doc. 91, Exh. F, at ¶ 7(B).) According to the Boatwrights, this contract language precludes application of the § 1702(a)(2) exemption here "because the contract of sale allows non-performance at the Seller's discretion due to reasons that are not legally recognized as defenses to contract actions in Alabama." (Doc. 110, at 22.)

The Eleventh Circuit recently rejected an indistinguishable argument in *Stein v. Paradigm Mirasol, LLC*, --- F.3d ----, 2009 WL 3110819 (11th Cir. Sept. 30, 2009). *Stein* involved a similar *force majeure* clause wherein the seller promised to complete the condominium unit within two years, subject to extension for delay caused by acts of God, weather conditions, governmental restrictions, labor strikes, and so on. The *Stein* plaintiffs, much like the Boatwrights, argued that applicable state law would not recognize impossibility of performance under the circumstances set forth in the *force majeure* clause. Notwithstanding these contractual exceptions to the two-year construction obligation, the Eleventh Circuit held that the condominium was exempt under § 1702(a)(2), reasoning as follows:

> "The Disclosure Act is an anti-fraud statute. ... Allowing for reasonable delays caused by events beyond the seller's control does not promote or permit fraud. It does not transform the seller's obligation into an option. ... Even though the

> contract excuses delays beyond the seller's control, it is still one 'obligating'
> Paradigm to complete construction of the condominium within two years for
> purposes of § 1702(a)(2) of the Disclosure Act."

*Stein*, 2009 WL 3110819, at *6.  This case is indistinguishable from *Stein*; therefore, the

reasoning and result of *Stein* are controlling here.[28]  The Court finds that the Boatwrights' unit is

exempt from the ILSFDA because the seller was obligated to complete construction of the

condominium within two years, subject to extension for reasonable delays caused by certain

limited events outside the seller's control.  The exempt status of the Boatwrights' unit is

---

[28]      In a Response (doc. 138) filed after summary judgment briefing had closed and
without leave of Court, plaintiffs contend that *Stein* is distinguishable because the words "at the
election of the Seller" appear in the *force majeure* clause in this case, but not in the
corresponding clause in *Stein*.  According to the Boatwrights, this language means that "the
instant two year provision [is] illusory because it allows nonperformance by the seller at the
seller's discretion."  (Doc. 138, ¶ 3.)  Plaintiffs' argument ignores the critical fact that, in the
Boatwrights' contract, the seller's discretion to extend the completion date beyond two years is
triggered <u>only</u> upon the occurrence of certain narrow events beyond the seller's control.  Bon
Secour (the seller in this case) had an absolute contractual obligation, just as the developer in
*Stein* did, to complete construction within two years, unless certain enumerated *force majeure*
events occurred.  All of those events were beyond its control.  The inclusion of the words "at the
election of the Seller" does not make Bon Secour's two-year obligation illusory because, just
like the developer in *Stein*, Bon Secour was contractually authorized to extend that period only
upon the occurrence of certain narrowly drawn, external events.  This is not a case in which the
developer could opt out with impunity; rather, Bon Secour's discretion to go beyond the two-
year period only came into play upon the occurrence of certain events that were outside of its
control.  Just as in *Stein*, the developer in this case could (but did not have to) extend the
construction completion date beyond two years upon the occurrence of certain *force majeure*
events that delayed the project.  That is not the kind of discretion which renders a two-year
completion requirement illusory under *Stein*.  Accordingly, the Court finds that the Boatwrights
are arguing a distinction from *Stein* that does not make a difference, and that the reasoning of
*Stein* is fully applicable here.
        Alternatively, plaintiffs contend that the completion deadline is illusory because
hurricanes (an event authorizing extension of the two-year deadline under the *force majeure*
clause) are "reasonably foreseeable by a developer of a condominium along the Gulf Coast"
(doc. 138, ¶¶ 4-5).  But the proposed "reasonably foreseeable" test finds no support in *Stein* and
does not appear ever to have been adopted by a published Eleventh Circuit decision.  This Court
will not do so here.  Besides, the *Stein* clause (which was found not to be illusory) included an
allowance for "weather conditions" for a condominium development in Fort Myers, Florida,
where hurricanes are also reasonably foreseeable, yet the *Stein* panel did not invalidate the clause
or deem it illusory on that basis, adopting a "beyond the seller's control" test rather than the
"reasonably foreseeable" standard championed by the Boatwrights.

dispositive of their ILSFDA cause of action; therefore, summary judgment will be granted in defendants' favor on those claims.

### C.      Plaintiffs Concede that their AUCA Cause of Action is Defective.

In plaintiffs' claim under the Alabama Uniform Condominium Act, the Amended Complaint alleged that the Poulos Defendants were "a declarant or affiliates of a declarant" and that they had violated the express warranty provisions of the statute.  (Doc. 53, ¶¶ 60-63.)  By its terms, the AUCA extends only to "[e]xpress warranties made by declarant, his affiliate, and any person in the business of selling real estate for his own account, to a purchaser of a unit."  Ala. Code § 35-8A-413(a).  On summary judgment, plaintiffs concede that "Carney and Poulos are not declarants or affiliates of declarants as those terms are currently defined in the Alabama Uniform Condominium [Act]."  (Doc. 105, at 28.)[29]  Because plaintiffs' sole theory of liability in their AUCA cause of action, as set forth in their Amended Complaint, was that the Poulos Defendants were "a declarant or affiliates of a declarant" and because plaintiffs now acknowledge that this theory is not available to them (without advancing any alternate legal basis under which the Poulos Defendants might be liable under the AUCA), summary judgment will be entered against plaintiffs as to this cause of action.

### D.      Plaintiffs' Other Claims Fail for Lack of Evidence of Causation or Reliance.

Plaintiffs' remaining claims against the Poulos Defendants sound in theories of fraud, negligence /wantonness, conspiracy, RICO conspiracy, and breach of fiduciary duty.  All of these causes of action require a showing of reliance and/or causation which plaintiffs cannot satisfy on this record; therefore, summary judgment is appropriately granted to the Poulos Defendants.

#### 1.      Fraud.

All of the Boatwrights' fraud-based claims require a showing of detrimental reliance on the allegedly fraudulent statements by the Poulos Defendants, and damages proximately caused by such reliance.  *See Drummond v. Walter Industries, Inc.*, 962 So.2d 753, 783 (Ala. 2006)

---

[29]      Although they prudently make this admission, plaintiffs do so in an awkward fashion.  They do not expressly concede that their AUCA claim should be dismissed, but instead simply admit that the Poulos Defendants were not declarants or affiliates of declarants, leaving it for the Court to ferret out the legal and practical consequences of this admission.

(elements of fraudulent suppression claim include requirements that plaintiff show that defendants' suppression of material fact induced plaintiff to act or refrain from acting, and that plaintiff suffered actual damage as a proximate result of same); *Luck v. Primus Automotive Financial Services, Inc.*, 763 So.2d 243, 246 (Ala. 2000) (plaintiff alleging fraud by misrepresentation must show "that the plaintiff reasonably relied on the misrepresentation" and "that the plaintiff incurred damage proximately caused by the reliance").

 To the extent that plaintiffs' fraud claims are rooted in representations made by the Poulos Defendants after the August 23, 2005 purchase agreement was executed, the Boatwrights cannot show proximate causation.  To be sure, plaintiffs insist that the Poulos Defendants' misrepresentations between August 2005 and September 2007 induced them to close, but the purchase agreement makes clear that the Boatwrights did not have a choice in the matter.  Once they signed that agreement, the Boatwrights were contractually obligated to complete the purchase of their unit.  Had the Boatwrights failed or refused to close, the seller was contractually entitled to initiate legal action to force them to do so.  Plaintiffs could not have been injured by any misrepresentations by the Poulos Defendants that induced them to do that which they were legally required to do anyway.  Thus, plaintiffs' contention that the post-August 2005 misrepresentations damaged them by lulling them into closing on their unit in September 2007 is meritless because the record unequivocally demonstrates that they were duty-bound to close in any event.  Plaintiffs' suggestion that they could simply "not have closed ... or at worst walked away from our $132,000 deposit as opposed to closing" (Mr. Boatwright Aff., ¶ 4; Mrs. Boatwright Aff., ¶ 4) disregards the plain language of the purchase agreement, which afforded them no such "walk-away" option.

 In the context of their fraud cause of action, the Boatwrights do offer evidence of alleged misrepresentations by the Poulos Defendants that predate the August 2005 purchase agreement. In particular, plaintiffs present evidence that, prior to August 2005, the Poulos Defendants informed them "that the Island Villas were all sold out, that the prices would be (or were) raised at least $100,000.00 for re-sale to end purchasers, that we would never have to close, and that there were end purchasers standing in line to buy."  (Mr. Boatwright Aff., ¶ 2; Mrs. Boatwright Aff., ¶ 2.)  The Boatwrights further aver that had they known the truth on any of these points, they "would not have entered the reservation agreement, paid our reservation deposit, entered

our purchase agreement, [or] paid our escrow deposit."  (Mr. Boatwright Aff., ¶ 2; Mrs. Boatwright Aff., ¶ 2.)  Thus, the Boatwrights' affidavits blame specific misrepresentations by the Poulos Defendants for deceiving them into entering into an agreement to purchase a Sunset Bay unit from Bon Secour.  This is the essence of plaintiffs' fraudulent inducement theory.  Unfortunately for plaintiffs, their own words do not support it.

With respect to the "sold out" allegation, plaintiffs' deposition testimony clashes with their affidavit statements that the Poulos Defendants had told them the condominium development was "all sold out."  The Boatwrights testified that Poulos informed them from the first time she met them that the developer had held back units from presales.  (Mrs. Boatwright Dep., at 44; Mr. Boatwright Dep., at 42, 271.)  So the Boatwrights were well aware from the beginning that not all units at Sunset Bay had been made available for presale, and that a certain number of them had been held back.  Moreover, while plaintiffs now take the position that the sale status of all units at Sunset Bay was of vital importance in persuading them to enter into this transaction, their testimony belies such a stance.  For example, plaintiffs never inquired of Poulos about how many people had entered into signed agreements to purchase units at Sunset Bay.  (Mr. Boatwright Dep., at 191-92.)[30]  Similarly, although a board in the clubhouse included a "sold out" legend, plaintiffs never inquired as to whether that meant the units were reserved or whether the names listed on the board were purchasers who had actually executed binding purchase agreements.  (*Id.* at 272.)  If plaintiffs had really been concerned about whether all of Sunset Bay was sold out, or just the presales, such questions would have been both natural and obvious.  More strikingly, while plaintiffs now say it was crucial for them to know whether all units had been sold, Mr. Boatwright admitted in his deposition that he did not ask how many units the developer had held back from presales because, in his words, "I didn't care."  (*Id.* at

---

[30]     To the extent that those prospective purchasers had only entered into reservation agreements, the Boatwrights knew or should have known from execution of their own reservation agreement for a Sunset Bay condo that such contracts in no way obligated the purchaser, and that buyers were free to walk away from reservation agreements and recover their initial deposit at any time and for any reason.

183.)[31]

Plaintiffs cannot survive summary judgment review by stitching together the aspects of their testimony that are most favorable to them, and ignoring the rest. *See, e.g., Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc) ("when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version*. Our duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part ....."). Accordingly, because plaintiffs admit in their depositions that (1) the Poulos Defendants told them from the outset that units had been held back from the presales (necessarily implying that fewer than all units had been sold), and (2) in any event plaintiffs "didn't care" how many units had been held back (and therefore not presold), the Boatwrights cannot predicate claims of fraud on any alleged "sold out" representations by the Poulos Defendants. By plaintiffs' admission, Poulos told them the truth from the beginning, negating any inference of fraudulent misrepresentation. And plaintiffs could not have detrimentally relied on any "sold out" representations because they admit that information concerning holdbacks (*i.e.*, unsold units) was of no consequence to them.

With respect to plaintiffs' affidavit statement that the Poulos Defendants had represented to them "that the prices would be (or were) raised at least $100,000.00 for re-sale to end purchasers," such an allegation cannot support a fraud cause of action for a number of reasons. First, and most obviously, the Alabama Supreme Court has consistently observed that "[a] mere statement of opinion or prediction as to events to occur in the future is not a statement of a

---

[31]     Mr. Boatwright testified elsewhere on this point as follows:

"Q:     [P]rior to the time you executed your purchase agreement, you became aware through speaking with Ms. Poulos that the developer had reserved some units?
"A:     Yes.  I was aware that he had some.  I didn't know how many, still don't.
"Q:     Did you ask her how many?
"A:     No.
"Q:     Did it matter to you?
"A:     I don't know that it mattered to me, particularly.
"Q:     Did you make any investigation as to what the developer was reserving or were not?
"A:     No, didn't figure it was any of my business."

(Mr. Boatwright Dep., at 271.)

'material fact' upon which individuals have the right to rely and, therefore, it will not support a fraud claim." *McCutchen Co. v. Media General, Inc.*, 988 So.2d 998, 1002 (Ala. 2008) (citation omitted); *see also Crown Investments, Inc. v. Bryant*, 638 So.2d 873, 877 (Ala. 1994) ("Ordinarily a prediction as to events to occur in the future is to be regarded as a statement of opinion only, on which the adverse party has no right to rely.") (citation omitted).  Even taken at face value, this representation is nothing more than a statement about possible listing prices for resale of plaintiffs' unit, not a representation that plaintiffs would realize a gain of $100,000 or more on such resale.  That a listing agent might opine that a future markup of $100,000 may be appropriate is not a statement of material fact and cannot support a fraud claim under Alabama law.[32]  Second, although *McCutchen* does not set forth an absolute prohibition on fraud claims based on a defendant's stated opinions concerning future events, the circumstances in which such representations might support that cause of action in Alabama are not present here.[33]  Third, once again, the Boatwrights' testimony negates their summary judgment suggestion that they were promised a $100,000 gain.  Mr. Boatwright acknowledged that the Poulos Defendants had told plaintiffs in writing that they could not guarantee any particular resale price, but could only recommend a figure at which the unit might be listed.  (Mr. Boatwright Dep., at 98.)  He conceded that the $100,000 markup was simply a "theoretical figure" that the parties were using for discussion purposes.  (*Id.* at 96.)  And he also agreed that resale values depend on fluctuating

---

[32]     Mr. Boatwright admitted that anything Poulos told him about possible listing prices for reselling the unit "had to be her opinion."  (Mr. Boatwright Dep., at 99.)  Thus, the Boatwrights understood that Poulos was merely offering her "opinion" for what their unit might fetch on the open market.  That kind of expression of opinion concerning future events is not the stuff of a fraud action in Alabama.  Additionally, knowing that Poulos's statements about $100,000 markups "had to be her opinion," the Boatwrights offer no evidence that they had any reason to put stock in that opinion, as needed to show reasonable reliance.

[33]     In particular, *McCutchen* teaches that "[w]here the representation of an opinion is involved, a person must prove not only that there was an intent to deceive, but also that his reliance was reasonable."  *McCutchen*, 988 So.2d at 1002 (citations omitted).  Plaintiffs offer only speculation that Poulos's pre-August 2005 statements concerning possible resale value were not her honestly held opinions.  And it would be unreasonable for the Boatwrights (who were experienced real estate market participants) to accept as gospel what they knew to be theoretical figures and opinions as to what their condo unit might be worth in the resale market.

market conditions.  (*Id.* at 102.)  Accordingly, plaintiffs cannot predicate a fraud claim on Poulos's opinions concerning $100,000 markups because those statements were mere opinions about future events, were not material facts, and were not reasonably relied on by plaintiffs.

Finally, plaintiffs' affidavits assert that Poulos represented to them "that we would never have to close, and that there were end purchasers standing in line to buy."  Once again, these are statements of opinion concerning future events (*i.e.,* whether an end purchaser would buy the Boatwrights' unit before closing) that are not actionable in fraud under a *McCutchen* analysis. Furthermore, Mr. Boatwright admitted that he didn't believe these assurances, stating that he had "suspected ... all along" that there was not someone standing by to purchase their unit.  (Mr. Boatwright Dep., at 127.)  And plaintiffs' deeds speak louder than their words as to their intentions.  The record reflects that the Boatwrights ordered the installation of a special bathtub in their unit for their daughter "[s]o she'd have it there when we were there."  (Mrs. Boatwright Dep., at 144.)  This evidence confirms that not only were the Boatwrights contemplating closing on their unit, but they were also contemplating staying in it on occasion.  This evidence is irreconcilable with plaintiffs' position that they relied to their detriment on Poulos' statements that they would not have to close because an end purchaser would be standing by to purchase their unit.  In light of this testimony, the necessary showing of reliance for these alleged representations to be actionable in fraud under Alabama law has not been made as to the "never have to close" and "end purchaser" representations.

In short, the summary judgment record is irreconcilable with the element of reasonable reliance which plaintiffs must show in order to prevail on their fraud causes of action against the Poulos Defendants.  *See, e.g., Hunt Petroleum Corp. v. State*, 901 So.2d 1, 4 (Ala. 2004) ("An essential element of any fraud claim is that the plaintiff must have reasonably relied on the alleged misrepresentation. ... Reliance requires that the misrepresentation actually induced the injured party to change its course of action.") (citations omitted).  The Boatwrights knew from the beginning that units had been held back from the presale, and they did not care how many, so they could not reasonably have relied on statements that the development was "sold out."  They knew that Poulos's statements about resale value were just her opinions concerning future events, subject to the vicissitudes and vagaries of market conditions, and could not reasonably have relied on those opinions.  They did not believe Poulos's statements of opinion that there

-29-

were willing buyers waiting in line, and they paid for special fixtures in their unit with the expectation that they would be staying there (which could only happen if they closed on the unit), so there was no reliance on Poulos's stated opinions that they would never have to close and that end users were standing by.  And, of course, any misrepresentations made after the August 2005 purchase agreement was executed are immaterial because they could not have caused plaintiffs' damages, given that the Boatwrights were contractually bound to close on the purchase of their unit and were not free simply to walk away from the deal and forfeit their letter of credit.

    2.    *Negligence / Wantonness.*

    As set forth in their summary judgment brief, the Boatwrights' theory animating their negligence and wantonness causes of action is that the Poulos Defendants "negligently and wantonly obtained the [September 2005 listing] agreement through misrepresenting that all units in the Island Villas were sold out, and that [Poulos] could serve the Boatwrights as their single agent."  (Doc. 105, at 32.)  Plaintiffs also cite alleged misrepresentations in late 2005 concerning the "sold out" status of Sunset Bay, and maintain that the Poulos Defendants "continued to represent the developer in direct competition to the Boatwrights [*sic*] interest."  (*Id.*)

    As a threshold matter, plaintiffs' contentions concerning duty and breach of duty are suspect, at best, at least insofar as they relate to the Poulos Defendants' role in plaintiffs' purchase of their unit.  Plaintiffs understood that the Poulos Defendants were acting <u>solely</u> as the seller's agent in connection with the purchase agreement executed in August 2005.  (Mr. Boatwright Dep., at 68; Mrs. Boatwright dep., at 58-61.)  Accordingly, any suggestion that the Poulos Defendants (as seller's agent) owed plaintiffs a duty to represent their interests in connection with that purchase agreement is conclusively refuted by plaintiffs' own admissions.

    Even assuming that plaintiffs have made a sufficient showing of duty and breach as to the September 2005 listing agreement, these claims nonetheless fail for lack of proof of causation and damages.  *See DiBiasi v. Joe Wheeler Elec. Membership Corp.*, 988 So.2d 454, 460 (Ala. 2008) ("In a negligence action the plaintiff must prove ... that the defendant's breach [of duty] was the actual and proximate cause of the plaintiff's loss or injury."); *Pitt v. Century II, Inc.*, 631 So.2d 235, 240 (Ala. 1993) ("One essential element of a claim for wantonness is causation," inasmuch as wanton conduct is not actionable unless the wanton "act or omission produced the

injury" of which the plaintiff complains) (citations omitted).  On its face, plaintiffs' single-agent listing agreement with the Poulos Defendants did not take effect until September 27, 2005, fully a month after plaintiffs had executed the purchase agreement.  By that time, of course, the Boatwrights had already become obligated to purchase their Sunset Bay unit, so any inaccurate representations made to them after that time could not possibly have caused their injuries (*i.e.*, the September 2007 closing and financial burdens on plaintiffs attendant thereto).[34]  As they have framed these causes of action on summary judgment, plaintiffs do not predicate their negligence and wantonness claims on any events preceding the execution of the August 2005 purchase agreement.  The Boatwrights do not contend, much less offer evidence, that they were induced into signing the purchase agreement because of any negligent or wanton acts by the Poulos Defendants.  Furthermore, although the Boatwrights assert that the Poulos Defendants deceived them into executing the listing agreement in September 2005, they do not identify any losses proximately caused as a result of same.

The point is straightforward: Plaintiffs in this case claim that they were injured because they agreed to purchase, and did purchase, a condominium unit worth less than they thought it was worth.  But the only acts of negligence and wantonness identified by the Boatwrights on summary judgment could not have caused plaintiffs' injuries because they had already entered into a binding legal obligation to purchase their unit, with no right to walk away or change their minds, before the alleged negligent or wanton conduct occurred.  Plaintiffs do not show that they

---

[34]     Plaintiffs note that the Poulos Defendants mailed the listing agreement to them on August 17, 2005, six days before execution of the purchase agreement.  The record bears out this chronology, but correspondence accompanying the listing agreement clearly reflects that the Poulos Defendants were merely offering to represent the Boatwrights in the resale process. Indeed, the August 17 letter included statements by Poulos that "Going forward, I'm prepared to represent 'YOU' ... as soon as you are ready to 'Flip;'" a statement that her commission would be "negotiable" with an invitation to the Boatwrights to call to discuss the matter; and a request that the Boatwrights "Please, fill out the listing agreement; call & we'll discuss the fee."  (Doc. 107, Exh. 13.)  Clearly, no fiduciary relationship had formed at that time; rather, the Poulos Defendants were simply making overtures to the Boatwrights in hopes of obtaining a listing agreement for their unit.  Moreover, the listing agreement had an effective date of September 27, 2005.  (*Id.*, Exh. 15.)  Taken in context, these facts negate any implication that the Poulos Defendants were representing the Boatwrights in connection with the contemplated resale at any time prior to plaintiffs' execution of the August 2005 purchase agreement.

suffered any losses or injuries as a result of entering into the listing agreement with the Poulos Defendants, or as a result of the alleged misrepresentations or divided loyalties by the Poulos Defendants in connection with the implementation of that listing agreement. Plaintiffs do not allege, much less show, that the Poulos Defendants conducted themselves in a negligent or wanton manner in endeavoring to resell plaintiffs' unit, or that plaintiffs sustained any injury as a result of same. Accordingly, the Poulos Defendants' Rule 56 motion is due to be granted as to the negligence/wantonness cause of action.

3.      *Breach of Fiduciary Duty.*

Plaintiffs' breach of fiduciary duty claim is a variation on a theme of the causes of action addressed already. According to their summary judgment brief, the Boatwrights contend that the Poulos Defendants breached fiduciary duties owed to them because they "did not disclose material information to the Boatwrights that was required for the Boatwrights to make an informed decision" about the proposed listing arrangement, "[n]amely, that the units were [not] sold out." (Doc. 105, at 28-29.) As discussed *supra*, however, plaintiffs' own testimony confirms that Poulos informed them the very first time she met them that certain Sunset Bay units had been held back from the presales, such that plaintiffs knew the development was not completely sold out. Plaintiffs cannot pursue a breach of fiduciary duty claim rooted in a theory that they did not know information that they have readily admitted the Poulos Defendants told them from the beginning.

Plaintiffs next posit that the Poulos Defendants breached a fiduciary duty because they "acted in direct competition with the Boatwrights" by representing the seller for developer units that had not been sold as well as the Boatwrights in the resale of their unit for a higher price than was being asked for the developer units. (Doc. 105, at 29.) But plaintiffs do not cite a single authority for the proposition that a real estate agent breaches a fiduciary duty by representing sellers of multiple units in the same condominium development, even at significantly different price points.[35] The Court will not expand Alabama's common law of fiduciary duties to reach

---

[35]      There is substantial authority to the contrary, albeit from other jurisdictions. For example, one court opined that "It has long been the common-law rule that a real estate broker can represent more than one seller or lessor at a time, and can show multiple properties to the same buyer, without breaching its fiduciary duty." *Sonnenschein v. Douglas Elliman-Gibbons &*

this scenario in the absence of any authority supporting same, or any compelling legal argument favoring such an approach.  The Boatwrights have submitted neither, but have simply stated in conclusory terms that the Poulos Defendants breached fiduciary duties owed to them by listing their property alongside other non-resale units at Sunset Bay which were being offered for lower prices.  That is not enough to carry the day on summary judgment.[36]

Furthermore, plaintiffs' breach of fiduciary duty claims fail for lack of damages. Plaintiffs submit no evidence that the Poulos Defendants did not diligently attempt to perform their responsibilities under the listing agreement.  They point to no evidence that the Poulos Defendants prevented, obstructed, impeded, sabotaged or negligently attempted to carry out the resale of their unit.[37]  As such, plaintiffs have failed to identify any damage caused by the alleged

_____

*Ives*, 713 N.Y.S.2d 9, 12 (N.Y.A.D. 1 Dept. 2000); *see also Coldwell Banker Commercial Group, Inc. v. Camelback Office Park*, 751 P.2d 542, 546 (Ariz. 1988) ("neither the law of the marketplace nor the general common law construes the [fiduciary] duty so broadly as to prohibit the broker from offering the properties of all his principals to a prospective customer"); *McEvoy v. Ginsberg*, 189 N.E.2d 546, 548 (Mass. 1963) ("in the absence of a special restrictive contract, a real estate broker is free to offer the properties of all his principals to a prospective customer").

[36]     It is not surprising that the Boatwrights fail to suggest that they were unaware that the Poulos Defendants were representing other putative sellers of units at the Sunset Bay development.  After all, the Poulos Defendants' offices were located at the Sunset Bay site, and the August 17 letter encouraging the Boatwrights to use the Poulos Defendants for resale of their unit was plainly a form letter being sent to all Sunset Bay purchasers.  And the Boatwrights knew that there were developer holdback units at Sunset Bay, as to which they should reasonably have surmised that the Poulos Defendants would be representing the developer, just as they had for all other Sunset Bay units.  The Poulos Defendants reinforced all these facts to the Boatwrights via letter dated October 28, 2005, that (1) identified both developer and resale units listed for sale, (2) stated that only one of those lots was being marketed with another agency, and (3) indicated that Carney was the only agency to have ever sold any Sunset Bay properties. (Doc. 107, Exh. 17.)  In short, plaintiffs well knew that the Poulos Defendants were representing sellers of both resale and developer units at Sunset Bay, yet the Boatwrights kept their listing agreement with the Poulos Defendants intact.

[37]     At most, plaintiffs state in their opposition brief that "Poulos did not list the Boatwrights' unit for re-sale until 2006."  (Doc. 105, at 29.)  However, plaintiffs provide no citations to the record in support of this proposition.  The Court will neither take counsel's word for it nor sift through an expansive record spanning thousands of pages in an effort to locate evidentiary support for this statement.  Even if there were evidence that the Poulos Defendants unreasonably delayed in listing the Boatwrights' unit for resale, there is no factual basis for

divided loyalties of the Poulos Defendants.  Under Alabama law, "[a] claim alleging breach of fiduciary duty sounds in tort ... and a necessary element to be proven in an action alleging breach of duty is damages."  *Systrends, Inc. v. Group 8760, LLC*, 959 So.2d 1052, 1075 (Ala. 2006) (citations and internal quotation marks omitted).  Plaintiffs having failed to show the existence of breach, causation or damages, summary judgment will be entered in the Poulos Defendants' favor as to the breach of fiduciary duty cause of action.

4.      *Conspiracy / RICO Conspiracy.*

Finally, plaintiffs also bring conspiracy and RICO conspiracy causes of action against the Poulos Defendants.  The common-law conspiracy claims fail for lack of evidence of an underlying tort, as documented above.  *See, e.g., Goolesby v. Koch Farms, LLC*, 955 So.2d 422, 430 (Ala. 2006) ("A civil conspiracy cannot exist in the absence of an underlying tort."); *Callens v. Jefferson County Nursing Home*, 769 So.2d 273, 280 (Ala. 2000) ("A conspiracy claim must fail if the underlying act itself would not support an action.") (citation omitted).  The RICO conspiracy claims fail because, for the reasons exhaustively described above, the record does not contain any evidence that plaintiffs were injured by any overt acts committed in furtherance of same.  *See Beck v. Prupis*, 162 F.3d 1090, 1098 (11th Cir. 1998) ("A civil RICO conspiracy claim requires a showing of ... the commission of an overt act in furtherance of the conspiracy that causes injury to the plaintiff.").  These claims will also be dismissed.

**V.      Conclusion.**

The Boatwrights took a calculated risk when they decided in the summer of 2005 to invest in a preconstruction condominium unit at Sunset Bay.  The market for condominiums along the Gulf Coast tanked shortly thereafter.  In this lawsuit, plaintiffs strived mightily to blame others for their misfortune, marshaling a slew of parallel, overlapping and redundant legal theories against the developer, the seller's agent, the appraiser, and the lender.  The crux of their lawsuit was that these participants in the transaction orchestrated a scheme of deception and lies to trick them into buying the unit.  But these claims fail to survive summary judgment scrutiny because the alleged misrepresentations and suppressed facts concerned matters (i) that were

---

concluding that the Boatwrights were adversely affected by the delay or that they were somehow deprived of an opportunity to resell their unit for the desired profit as a result of same.

-34-

actually known to plaintiffs, (ii) that were not false or deceptive, (iii) that plaintiffs admitted they did not care about or did not rely on, (iv) that were nonactionable statements of opinion concerning future events, and/or (v) that occurred after the Boatwrights entered into an unconditional purchase agreement to buy their unit.  No matter how tangled and complex a web plaintiffs have attempted to construct with their extensive recitation of causes of action, they have not presented sufficient facts to ensnare these defendants.  Accordingly, it is hereby **ordered** as follows:

1.  Plaintiffs' Motion to Supplement Record (doc. 111) and the Poulos Defendants' Motion for Leave to File Eighteen Page Reply Brief (doc. 121) are both **granted**. The proposed record supplementation and reply brief will be considered as filed, and need not be resubmitted at this time.

2.  Plaintiffs' Motion to Strike (doc. 124) is not material to the disposition of the pending motion for summary judgment, and is therefore **moot**.

3.  The Poulos Defendants' Motion for Leave to File a Supplemental Authority (doc. 134) is **denied** because there is no reason for a copy of the published *Stein v. Paradigm Mirasol* decision to be included in the court file; however, the Court duly notes the existence of that decision.

4.  Shirlee Poulos and Carney Realty, Inc.'s Motion for Summary Judgment (doc. 93) is **granted**.  All claims asserted against those two defendants are **dismissed with prejudice** for the reasons set forth herein.  A separate judgment will enter.

5.  Inasmuch as this ruling disposes of all remaining claims in this action, the Clerk's Office is directed to close this file for administrative and statistical purposes.

**DONE** and **ORDERED** this 29th day of October, 2009.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE